# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | |
|---|---|
| THE ESTATE OF LEEROY HICKMAN, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:09-CV-69 |
| ) | *Consolidated with* |
| DOUG MOORE, *et al.*, ) | 3:09-CV-102 |
| ) | (VARLAN/SHIRLEY) |
| Defendants. ) | |

## **MEMORANDUM OPINION**

This civil action is before the Court on the following motions: Motion for Summary Judgment of Doug Moore, Lesley Craig, Robert Berkley, and Matthew Gilmore in their Individual Capacity [Doc. 71]; Defendant Blount County's Motion for Summary Judgment [Doc. 106]; plaintiff's Appeal and Objection to Magistrate's Ruling Denying Rule 56(f) Continuance for Discovery and Granting Motion for Protective Order [Doc. 113]; and Plaintiff's Rule 56(f) Motion to Hold in Abeyance Ruling on Defendant, Blount County's, Motion for Summary Judgment Until Oral Discovery is Conducted and All Cell Phone Records are Produced [Doc. 115].

The Court has carefully considered the filings and arguments of the parties [*see* Docs. 88, 92, 96, 101, 107, 109, 110, 114, 116, 118, 122, 123, 124, 125, 126, and 127] in light of the applicable law, and, for the reasons explained below, the Court will grant in part and deny in part the Motion for Summary Judgment of Doug Moore, Lesley Craig, Robert Berkley, and Matthew Gilmore in their Individual Capacity [Doc. 71]; the Court will grant

Defendant Blount County's Motion for Summary Judgment [Doc. 106]; the Court will deny plaintiff's Appeal and Objection to Magistrate's Ruling Denying Rule 56(f) Continuance for Discovery and Granting Motion for Protective Order [Doc. 113]; and the Court will deny Plaintiff's Rule 56(f) Motion to Hold in Abeyance Ruling on Defendant, Blount County's, Motion for Summary Judgment Until Oral Discovery is Conducted and All Cell Phone Records are Produced [Doc. 115].

## I.      Relevant Facts and Procedural History[1]

This action arises out of the execution of an assault warrant for domestic violence. Plaintiff is the estate for decedent LeeRoy Hickman, Jr. [Doc. 35]. Defendants Doug Moore ("Moore"), Lesley Craig ("Craig"), Robert Berkley ("Berkley"), Matthew Gilmore ("Gilmore") and John Doe I (Moore, Craig, Berkley, and Gilmore collectively, the "individual defendants" or "officers") are deputy sheriffs for Blount County, Tennessee [*Id.*]. Defendant Blount County, Tennessee ("defendant Blount County") is a political subdivision of the State of Tennessee [*Id.*].

On February 23, 2008, Mr. Hickman assaulted his wife at their residence in Blount County, Tennessee [Docs. 72, 107]. Mr. and Mrs. Hickman's daughter Christine Boring and her son witnessed the altercation, and Ms. Boring was successful in ceasing the altercation [*Id.*]. That same day, Mrs. Hickman left the home and went to her aunt's home [*Id.*]. During

---

[1] The facts in this case primarily are established by the statements of the officers, which have been submitted by all parties. To the extent that the facts as stated by the officers are in dispute, such is noted herein.

the morning of February 24, 2008, Blount County officers went to the Hickman residence to retrieve Ms. Boring and her son [*Id.*].  Mr. Hickman was at the Hickman residence during this time [*Id.*].

Thereafter, Mrs. Hickman obtained an order of protection as well as an assault warrant for domestic violence [*Id.*].  In her affidavit of complaint, Mrs. Hickman informed Blount County officers and Judicial Commissioner Robert Brown ("Commissioner Brown") that:

> On Saturday night at 7:00 pm, I cooked dinner [for her husband] and he came in the kitchen and I told him to come and eat dinner. He [LeeRoy Hickman] suddenly turned and started cussing then grabbed me at the face at both eyes. I have had eye surgery on January 31, 2007, and he grabbed both eyes and dragged me across the kitchen and back me up to the kitchen cabinets and called me a g** d*** bi***.  About that time my daughter Christy Boring, came up and got in between us and got him away from me but he was still trying to get me. I know that if my daughter had not stopped him he was going to hurt me very badly. He has threatened me so many times to kill me I really thought it was going to happen. Episodes like this are common in our house.

[*Id.*].  Ms. Boring further informed Blount County officers:

> My father has stated numerous times that if my mother or I ever called the police or if we told anyone to come to the house that he would make us famous.  He said he had an arsenal and he would not let the police take him alive.  He will shoot until he is out of ammo and will then take his own life. He has told me that he has a semi automatic weapons and that he would use it. He says that he is ready if it ever happened.

[*Id.*].

Commissioner Brown then made a probable cause determination that Mr. Hickman had violated Tennessee's domestic assault statute, Tenn. Code Ann. § 39-18-111, and issued a warrant for Mr. Hickman's arrest [*Id.*].  Above his name, Commissioner Brown noted the

following: "Use extreme caution. This is a statement from his daughter. He has weapons and he said he would use them." [Doc. 72].

The warrant was delivered to Corporal Parton, the Day Shift Supervisor of the Patrol Unit, a unit trained and authorized to execute criminal arrest warrants [*Id.*]. The execution of the warrant, however, was handled during the evening shift by Moore [Docs. 72, 107]. Moore confirmed the existence of the arrest warrant and, during the course of February 24, 2008, along with Craig, Gilmore, and Berkley, learned that Mr. Hickman stated that he would shoot the police if they came to his house and that he had several weapons [Docs. 72, 88-4, 107]. Moore, Craig, Gilmore, and Berkley then devised a plan, along with Chief Jimmy Long, to get Mr. Hickman out of his house and prevent him from getting to his weapons [Docs. 72, 88-4, 107, 123].

According to the statements of the officers, the plan consisted of Craig, dressed in plain clothing, stopping in an unmarked vehicle in front of the Hickman home and raising the hood of the vehicle to see if Mr. Hickman would come out of the house to assist her [Docs. 72, 88-4, 88-5, 107]. The officers hoped Mr. Hickman would do so because she was close in age to his daughter [*Id.*]. If Mr. Hickman came out of the house, the officers would then announce themselves and arrest Mr. Hickman [*Id.*].

As Craig attempted to feign distress, Mr. Hickman did not come out of the house to assist her [*Id.*]. Accordingly, Craig knocked on the front door of the house and made a request that someone help her with her vehicle [Docs. 72, 88-4, 88-5]. Although Craig heard someone move in the house as though they were looking out the window to the left of the

front door, Mr. Hickman did not respond to her presence [Docs. 72, 88-5]. Craig then went back to the vehicle and back to the Hickman residence one or two more times without response from Mr. Hickman [Doc. 88-5].

After these failed attempts to get Mr. Hickman's attention, Moore picked-up Craig as if he were a passer-by and the two went to a nearby church where Moore called Mrs. Hickman to determine whether Mr. Hickman was home [Docs. 72, 88-4, 88-5, 107]. Mrs. Hickman informed the officer that Mr. Hickman had been in a rage all day and that they should be careful [Docs. 72, 88-4]. Craig then called the Hickman residence around 10:55 p.m. and spoke with Mr. Hickman [Docs. 72, 88-4, 88-5, 96]. Craig acted as though she was a friend of Mr. Hickman's daughter and asked to speak to Christy [Docs. 88-4, 88-5, 96, 123]. She was told that Christy would be back in the morning [Docs. 88-4, 88-5, 92, 96, 123].

Determining that Mr. Hickman was awake, the officers attempted to get Mr. Hickman out of his house one more time [Doc. 88-5]. Craig went back to the vehicle and then again to the front door of the Hickman house [Docs. 72, 88-5, 107]. After Craig knocked on the door, she saw someone open the blinds to a window [Doc. 88-5]. She yelled "oh, thank God" and requested assistance with her vehicle [Doc. 88-5]. Mr. Hickman, wearing only green boxers, opened the front door and stood sideways so that Craig could see only his left side [Docs. 88-5, 96]. After Craig asked Mr. Hickman for assistance with her vehicle, Mr. Hickman retrieved a flashlight for her and went back inside [*Id.*]. Craig then made several requests that Mr. Hickman help her because the flashlight was about to "die" [Docs. 88-5,

96, 123]. Mr. Hickman, wearing different clothing and with his hands in his pockets, subsequently came out of the house to assist Craig [Docs. 72, 88-5, 96]. As he came out of the house, Craig observed Mr. Hickman walk around the yard in a zigzag pattern "looking" with his hands in his pockets [Doc. 88-5]. She also saw Berkley near the house out of the corner of her eye [*Id.*].

There is some disagreement regarding the events that occurred at this time. Defendants submit that Moore, Gilmore, and Berkley were to the side of the house next to the neighbor's house and observed Mr. Hickman go to the vehicle and look under the hood with his hands on the vehicle [Docs. 71-3, 71-4, 72, 88-4, 88-5, 88-6, 88-7]. Craig proceeded to the back of the vehicle pursuant to the plan [Docs. 71-2, 88-5]. Moore, Gilmore, and Berkley then ran across the yard and approached Mr. Hickman; as they did so, they yelled "sheriff's office, sheriff's office" [Docs. 72, 88-4, 88-6, 88-7]. Berkley also yelled "sheriff's office, show me your hands" [Docs. 72, 88-6, 88-7].

Moore, Gilmore, and Berkley contend that Mr. Hickman did not comply with their commands and instead took his right hand, placed it into his coat pocket, and brought it up in his jacket as if he were pointing a gun at Moore [Docs. 72, 88-4, 88-6, 88-7]. Gilmore, in particular, saw Mr. Hickman's jacket stick out from his body approximately two feet [Doc. 88-7]. Moore then saw Mr. Hickman scan him for "just a second," and, to avoid being a stationary target, proceeded across the street and yelled "gun, gun, gun" [Docs. 72, 88-4, 88-6, 88-7]. During this time, Gilmore and Berkley continued to yell "let us see your hands" [Docs. 72, 88-4, 88-6, 88-7]. Mr. Hickman, however, did not comply, and Gilmore and

Berkley yelled again "let me see your hand" [Docs. 72, 88-4, 88-6, 88-7]. Berkley then racked his shotgun, and Mr. Hickman turned toward him and Gilmore [Docs. 88-4, 88-6].

Craig, after hearing the other officers yelling and noticing that there was no cover for Moore, advanced toward the front of the vehicle and drew her pistol [Docs. 72, 88-4, 88-5]. When Craig reached the front of the truck, she saw Mr. Hickman, turned toward the house with his back to her, looking for Gilmore and Berkley [Docs. 72, 88-5]. Although Craig did not see Mr. Hickman with a gun, she fired her gun at Mr. Hickman's back until her magazine racked back [Doc. 88-5]. Moore then fired two more shots at Mr. Hickman because Mr. Hickman was still standing and Moore believed he was still a threat [Docs. 72, 88-4]. Mr. Hickman then fell into a ditch [Docs. 72, 88-4, 88-6, 88-7].

According to plaintiff, the officers were using an open cell phone line to monitor Craig's interactions with Mr. Hickman, and at 11:06 p.m., Craig's cell phone died [Docs. 92, 123]. Moore, Berkley, and Gilmore then panicked and Moore called a second cell phone for Craig at 11:08 p.m. [*Id.*]. Because they could not reach Craig, the three then ran "at a full sprint" toward Mr. Hickman and Craig [*Id.*]. Craig saw Moore running with his gun drawn and also panicked [*Id.*]. Plaintiff states that Craig did not see Mr. Hickman hold a gun or have his hand raised but saw Mr. Hickman look for Gilmore and Berkley and heard Moore yell "gun, gun, gun" [*Id.*]. As a result, plaintiff submits that at 11:11 p.m. Craig unloaded her entire magazine at Mr. Hickman's back [Docs. 92, 101-2, 123]. Plaintiff also submits that Moore shot at Mr. Hickman's back gratuitously and in reaction Craig shooting Mr. Hickman [Doc. 92].

With respect to their actions after the shooting, plaintiff submits that four minutes passed before an ambulance was called [Doc. 123]. During this time, one or more of the officers moved Mr. Hickman's body from the location where it fell and one or more officers went into the Hickman residence [Docs. 101-2, 123].

Plaintiff also submits that officer's recollections regarding how they found the gun vary. Moore indicates that he instructed the other officers to secure Mr. Hickman's hands [Doc. 88-4]. After handcuffing his wrists, Moore stated that the officers rolled Mr. Hickman one way and found a handgun [*Id.*]. Craig submits that the gun fell out of Mr. Hickman's pocket onto the ground [Doc. 88-5]. Gilmore, however, indicates that the officers had difficulty getting Mr. Hickman's hands out of his pockets and that, after he was handcuffed, the officers pulled up Mr. Hickman and saw a black pistol under the leaves [Doc. 88-7].

Plaintiff further submits that, at 11:18 p.m., Officer Hernandez of the Alcoa Police Department arrived at the scene, where it was dark and rainy, and saw an officer standing in the middle of the road waiving a flashlight [Doc. 123]. One of the male officers spoke to Officer Hernandez and stated: "He wouldn't pull his f[*****] hands out of his pockets. He's already known to have assault weapons." [Doc. 123].

Also after the shooting, Mrs. Hickman and Mr. Hickman's daughter were questioned for approximately two hours regarding his alleged wrongdoing [Docs. 92, 123]. It is alleged that they were then informed of Mr. Hickman's death and the officers requested permission to search the home [*Id.*]. According to plaintiff, defendants took possession of the home, took photos of a gun at the scene which Ms. Hickman denies he would have carried, took a

photo of a gun holster by a night stand where no gun was kept, ordered that all evidence be taken from the scene, and ordered that the Hazmat team wash away evidence of the location of Mr. Hickman's body when shot [*Id.*].

Plaintiff subsequently filed suit alleging violations of 42 U.S.C. §§ 1983 and 1988, in addition to state law claims for assault and battery, wrongful death, violations of the Tennessee Constitution, violations of Tennessee's Governmental Tort Liability Act ("GTLA"), and violations of the common law duty of office [*See* Doc. 1]. Plaintiff also filed suit in state court asserting the same claims based on the same facts against the same defendants [*See* Doc. 32]. The state court action was removed to federal court and consolidated with this case [*Id.*]. The Court remanded the GTLA and other state law claims to the state court and granted plaintiff leave to file an amended complaint to assert the proper party as the plaintiff and to include an excessive force claim against defendant Blount County based on failure to supervise and deliberate indifference [*See id.*; Doc. 35].

## II.    Defendants' Motions for Summary Judgment

As noted, plaintiff's claims arise under 42 U.S.C. § 1983. To state a claim under section 1983, a plaintiff must set forth "facts that, when construed favorably, establish (1) deprivation of a right secured by the Constitution or the laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citation omitted). A suit against a municipality, such as defendant Blount County, involves a two-prong inquiry: the Court must determine whether the plaintiff has been deprived of a constitutional right and whether the municipality is responsible for

that violation. *Cash v. Hamilton Cnty. Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004).

### A.     Standard of Review

A court may grant summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). The Court views the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Catrett*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question

for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250.

### B.  Motion for Summary Judgment of Doug Moore, Lesley Craig, Robert Berkley, and Matthew Gilmore in their Individual Capacity

Plaintiff asserts that Moore, Craig, Berkley, and Gilmore violated plaintiff's rights under the Fourth Amendment to the United States Constitution to be free from the use of excessive force and to be free from unreasonable seizures [*See* Doc. 35]. The officers move for summary judgment on the basis of qualified immunity [Doc. 71]. They submit that they did not commit a constitutional violation of "excessive force" because their actions were objectively reasonable [*Id.*]. They also submit that they did not violate any clearly established right of Mr. Hickman [*Id.*].

### 1.  Doctrine of Qualified Immunity

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation"; it is "an immunity from suit rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1986); *Estate of Carter v. City of Detroit*, 408 F.3d

305, 310-11 (6th Cir. 2005) (citation omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (citation omitted). "Government officials who perform discretionary functions are generally protected from liability for civil damages as long as their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Holzemer v. City of Memphis*, No. 09-5086, 2010 WL 3565501, at *4 (6th Cir. Sept. 15, 2010) (citations omitted).

A three-step analysis is employed in the Sixth Circuit for analyzing claims of qualified immunity: first, a court determines whether, "based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred"; second, a court considers "whether the violation involved a clearly established constitutional right of which a reasonable person would have known"; and third, a court determines "whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Id.* (citations omitted). There is no requirement that the sequence of this inquiry be followed, *Holzemer*, 2010 WL 3565501, at *4 (citing *Pearson v. Callahan*, — U.S. —, 129 S. Ct. 808, 813, 172 L.Ed.2d 565 (2009)), and, if a plaintiff fails to establish any one element, then qualified immunity must be granted, *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (citation omitted).

With respect to analyzing a summary judgment motion based on qualified immunity, the Court must adopt plaintiff's version of the facts. *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (citation omitted). Granting summary judgment on the basis of qualified immunity is inappropriate if there is a factual dispute involving an issue on which the question of immunity turns or if the undisputed facts show that a defendant's conduct did indeed violate clearly established rights. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000) (citations omitted).

### 2. Whether the Officers are Entitled to Qualified Immunity

The primary question in determining whether the officers are entitled to qualified immunity is whether they violated Mr. Hickman's constitutional right to be free from excessive, or in this case deadly, force. The Supreme Court has held that "the Fourth Amendment prohibits a police officer's use of deadly force to seize an unarmed, non-dangerous suspect." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). An officer may use deadly force, however, where there is probable cause to believe the "suspect poses a threat of serious physical harm either to the officer or to others." *Garner*, 471 U.S. at 11.

A claim that excessive deadly force was used during the course of a seizure is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the determination must be made "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

13

*Id.* at 396-97. The Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Also, in the Sixth Circuit, a time-segmented analysis applies to excessive force claims. The Court should not consider whether it was reasonable for the officers to create the circumstances leading to the seizure, but instead must "focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force." *Livermore v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (citation omitted).

Once the relevant set of facts is determined and all inferences are drawn in the plaintiff's favor, at the summary judgment stage, the question whether an officer's actions were "objectively unreasonable" is a pure question of law. *Chappell v. City of Cleveland*, 858 F.3d 901, 909 (6th Cir. 2009) (citations omitted). Summary judgment is inappropriate "where there are contentious factual disputes over the reasonableness of the use of deadly force." *Murray-Ruhl v. Passinault*, 246 Fed. Appx. 338, 343 (6th Cir. 2007) (unpublished) (citation omitted). Moreover, "where an officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care." *Burnette v. Gee*, 137 Fed. Appx. 806, 809 (6th Cir. 2005) (unpublished) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)). In such situation, the Court must "undertake a fairly critical assessment of the forensic evidence, the

officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial." *Plakas*, 19 F.3d at 1147.

### a.    Officer Lesley Craig

The primary question for determining whether summary judgment is appropriate as to Craig is whether Craig had probable cause to believe that Mr. Hickman posed a threat of serious physical harm to herself or to others. After considering the facts and circumstances as alleged by plaintiff and analyzing the record with particular care, the Court finds Craig had probable cause.

Although plaintiff claims the reason Craig shot Mr. Hickman[2] was because she panicked and not because Mr. Hickman posed a threat, plaintiff's panic theory lacks merit. Reviewing the record as a whole, including Craig's statements from after the shooting and her affidavit, as well as other evidence submitted to the Court, there is no basis to infer any panic; indeed, neither the word panic nor any similar word was used by Craig during her interview after the shooting. Moreover, Craig stated that she was talking loudly so that the other officers could hear her interactions with Mr. Hickman and she saw Berkley out of the corner of her eye when Mr. Hickman came out of the house. These facts do not suggest panic, but instead that Craig was in control of the situation. Accordingly, the Court need not accept plaintiff's theory that Craig shot Mr. Hickman because she panicked. *See Denning*

---

[2] Given that Mr. Hickman was shot more than two times [*see* Doc. 88-8] and that it is undisputed that only Moore shot at Mr. Hickman an additional two times, the Court presumes that at least one of the shots fired by Craig hit Mr. Hickman.

*v. Metro. Gov't of Nashville*, 564 F. Supp. 2d 805, 815 (M.D. Tenn. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007) for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion"), *aff'd by* 330 Fed. Appx. 500 (6th Cir. 2009).

Rather, reviewing the record as a whole, and construing the facts in favor of plaintiff, it is undisputed that Craig approached the situation with knowledge that Mr. Hickman was likely armed and willing to shoot any police officer that came to arrest him. Craig also had been interacting with Mr. Hickman during the course of the execution of the plan to get him out of his house and knew that he had changed clothes to come outside and that had his hands in his pockets as he walked around the front yard "looking." It further is undisputed that, immediately prior to the shooting, Craig was at the back of the "broken-down" vehicle and saw Moore running toward Mr. Hickman with his gun looking for cover. She also heard her fellow officers yelling "gun, gun, gun" and "let me see your hands." Craig approached the front of the vehicle and saw only Mr. Hickman's back. Craig did not see whether Mr. Hickman had a gun or the position of his hands; rather, she saw Mr. Hickman look for Berkley and Gilmore toward the house.

Even though plaintiff submits that Craig did not act reasonably because she did not see Mr. Hickman with a gun, the relevant question is not whether Mr. Hickman had a gun, but whether Craig believed Mr. Hickman posed a threat of serious physical harm immediately before he was shot. Even assuming Mr. Hickman did not have a gun and that

he did not raise his hand in his pocket as if he had a gun, plaintiff has submitted nothing to contradict Craig's belief that Mr. Hickman was threatening to others at the time she fired. In particular, plaintiff submitted nothing to contradict the evidence that Craig knew Mr. Hickman had made threats to kill any officer that came to arrest him, that Craig observed Mr. Hickman change clothes and come out of the house "looking," that Craig saw Moore running down the front yard with his gun drawn, that the officers yelled "sheriff's office," "let us see your hands," and "gun, gun, gun," and that Mr. Hickman was looking for Berkley and Gilmore when she approached the front of the vehicle. In addition, although plaintiff also argues that Mr. Hickman had his back turned to Craig and was retreating toward his house when he was shot, it does not mean that Craig could not have reasonably believed that Mr. Hickman posed a threat to her fellow officers. *See Brosseau v. Haugen*, 543 U.S. 194, 199-201 (2004) (discussing cases where courts found no Fourth Amendment violation when an officer shot a fleeing suspect who presented a risk to others).

With respect to plaintiff's argument that Craig shot Mr. Hickman without warning, the Court finds the argument insufficient to overcome Craig's request for qualified immunity. Indeed, some warning must be given where feasible before employing deadly force, *Garner*, 471 U.S. at 11-12, but it is undisputed that the other officers repeatedly informed Mr. Hickman to show his hands.

Judging Craig's actions from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, immediately prior to firing, Craig was forced to make a split-second decision that Mr. Hickman posed a serious risk of physical harm to

herself or to others based on the knowledge she possessed about Mr. Hickman as well as the statements and actions of her fellow officers. The Court finds that Craig's use of deadly force was reasonable under the circumstances. Craig is entitled to summary judgment based on qualified immunity and will be dismissed from this case.

### b.    Officer Doug Moore

Under plaintiff's version of the facts, Moore shot Mr. Hickman[3] after Craig fired at him because Mr. Hickman was still standing and Moore felt that he was still a threat. Plaintiff claims that Moore shot at Mr. Hickman's back gratuitously and in reaction to Craig shooting Mr. Hickman. In support, plaintiff submits the opinion of an expert, who opines that, "even if it is to be believed that Hickman was pulling a Dick Tracy type stunt and going to attempt to fire at the officers from inside his jacket . . . , by the time Moore had determined to shoot, Hickman had turned away and was heading in the direction of his house." [Doc. 88]. Because plaintiff has raised a genuine issue of material fact whether Mr. Hickman was threatening at the time Moore shot him, summary judgment will be denied as to Moore. *See Bouggess v. Mattingly*, 482 F.3d 886, 895 (6th Cir. 2007) (discussing *Dickerson v. McClellan*, 101 F.3d 1151, (6th Cir. 1996), where the district court found an officer was not entitled to qualified immunity because it was disputed whether the suspect was non-threatening when he was shot).

---

[3] It is unclear to the Court whether any of the shots fired by Moore hit Mr. Hickman. Accordingly, and for purposes of the qualified immunity analysis, the Court presumes that at least one of the shots fired by Moore hit Mr. Hickman.

Plaintiff also has produced evidentiary support for his version of the events that occurred post-shooting, which raise questions regarding the circumstances under which Moore shot Mr. Hickman, including, but not limited to, the following: conflicting statements of the officers regarding how they found the gun; photos taken of the gun allegedly held by Mr. Hickman, which indicate a lack of blood on the gun; Mrs. Hickman's statement that the gun found with Mr. Hickman was one he did not normally carry; Mrs. Hickman's statement that Mr. Hickman did not keep a gun on the night stand; the statement of the neighbor who saw officers carrying weapons out of the Hickman residence after shots were fired; whether there was sufficient light for Moore to determine Mr. Hickman was threatening; and records indicating a lapse in time between the shooting and the time an ambulance was called [Docs. 88, 92, 101, 109, 123].

If one were to believe plaintiff's version of the facts post-shooting, one could reasonably find, for example, that Moore unreasonably believed Mr. Hickman was threatening or that Moore, and Gilmore and Berkley, did not see Mr. Hickman raise his hand as if he had a gun. Accordingly, in addition to the reason stated above, the Court will deny summary judgment as to Moore. *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) (citation omitted) (nothing that summary judgment should be denied where the question of qualified immunity turns upon which version of the facts one accepts).

### c.    Officers Robert Berkley and Matthew Gilmore

At oral argument, counsel for Berkley and Gilmore requested that the Court summarily dismiss them from this case because neither shot Mr. Hickman. Plaintiff

19

submitted to the Court that the two officers should remain in the case to the extent that the plan to arrest Mr. Hickman was unconstitutional, but admitted that, otherwise, there was no basis for either officer to remain in the lawsuit.

Plaintiff's claim against Berkley and Gilmore is that they used excessive force against Mr. Hickman [Doc. 35]. Whether it was reasonable for officers to create the circumstances that lead to a seizure, however, is not relevant to determining an excessive force claim. *Livermore*, 476 F.3d at 406 (citation omitted). Thus, plaintiff's argument that the plan was unconstitutional lacks merit.

A review of the record demonstrates that it is undisputed that neither Berkley nor Gilmore fired a weapon during the course of the attempted arrest. Neither officer, therefore, effected a seizure of Mr. Hickman and neither officer violated the Fourth Amendment. Gilmore and Berkley, accordingly, are entitled to summary judgment and will be dismissed from this case. *See Moore v. City of Cleveland*, No. 1:03-CV-01258, 2006 WL 2947052, at *2 (N.D. Ohio Oct. 16, 2006) (granting summary judgment with respect to a police officer who did not shoot the suspect but fired his weapon at the suspect as he was fleeing) (citations omitted).

### C.     Defendant Blount County's Motion for Summary Judgment

Defendant Blount County moves for summary judgment asserting that it is entitled to judgment as a matter of law [Doc. 106]. In response, plaintiff filed Plaintiff's Rule 56(f) Motion to Hold in Abeyance Ruling on Defendant, Blount County's, Motion for Summary Judgment Until Oral Discovery is Conducted and All Cell Phone Records are Produced [Doc.

115]. Given that the Court's ruling on such motion impacts its decision whether defendant Blount County is entitled to summary judgment at this time, the Court must address plaintiff's Rule 56(f) motion before addressing defendant Blount County's motion for summary judgment.

        **1.**     **Plaintiff's Rule 56(f) Motion to Hold in Abeyance Ruling on Defendant, Blount County's, Motion for Summary Judgment Until Oral Discovery is Conducted and All Cell Phone Records are Produced**

Pursuant to Rule 56(f), plaintiff requests that the Court enter an order holding in abeyance the ruling on defendant Blount County's motion for summary judgment until certain discovery is completed [Doc. 115]. In particular, plaintiff seeks to obtain records from the second cell phones of the officers; to depose the four training officers of Craig; and to depose two Rule 30(b)(6) witnesses to be designated by defendant Blount County [*Id.*]. Plaintiff asserts that the discovery sought is material because it will "show County officials' participation in and liability as a moving force for the individual officers' conduct" [*Id.*]. Defendant Blount County asserts that plaintiff's request for additional discovery is insufficient because plaintiff does not seek facts essential to justify his opposition to defendant Blount County's motion [Doc. 124].

Former Rule 56(f) of the Federal Rules of Civil Procedure[4] provides that "[i]f a party opposing [a motion for summary judgment] shows by affidavit that, for specified reasons,

---

[4] Rule 56(f) became Rule 56(d) without substantial change as a result of the 2010 amendments, effective December 1, 2010.

it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order."  The burden is on the party seeking additional discovery to demonstrate why such is necessary.  *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004) (citation omitted).  "Bare allegations or vague assertions of the need for discovery are not enough."  *Id.* (citation omitted).  Rather, the nonmovant must "with some precision" state "the materials he hopes to obtain with further discovery, and exactly how he expects those materials would help him in opposing summary judgment." *Id.* (citation omitted).

With respect to the personal cell phone records of the officers, plaintiff merely states that they will better reveal what other county officials were involved in the operation and when.  Plaintiff has not stated how the personal cell phone records are material to any custom, policy, or practice of defendant Blount County, and it does not appear that they would in any way be helpful in opposing defendant Blount County's motion for summary judgment.

With respect to the request to depose the training officers, plaintiff states that they can testify as to whether Craig was incompetent to safely handle a gun.  However, such testimony does not appear to be material to any custom, policy, or practice of defendant Blount County that was the moving force in any violation of Mr. Hickman's constitutional rights, and merely showing that a particular officer was unsatisfactorily trained does not give rise to municipal liability. *Walker v. Norris*, 917 F.2d 1449, 1456 (6th Cir. 1990) (citation omitted).

22

With respect to the request to depose the Rule 30(b)(6) witnesses, plaintiff states that they could confirm a practice of defendant Blount County overlooking excessive force complaints, in particular with respect to Moore, and whether defendant Blount County has a custom of allowing unconstitutional conduct, including that of "selective or vindictive warrant service." Although such discovery could be relevant to opposing defendant Blount County's motion for summary judgment, defendant Blount County has informed the Court that it produced discovery relating to excessive force complaints and the county's warrant service policy. As plaintiff has failed to provide compelling reasons that additional discovery on the matters is necessary, the Court declines to grant plaintiff's request.

To the extent that plaintiff's Rule 56(f) affidavit requests discovery regarding spoliation [*see* Doc. 115-1], the Court finds that such is not material to opposing defendant Blount County's motion for summary judgment. It does not relate to any custom, policy, or practice of the county that, even potentially, was a moving force behind a violation of Mr. Hickman's constitutional rights. Rather, such discovery is relevant, at best, to the claims asserted against the individual defendants.

In sum, the Court will deny plaintiff's request to hold in abeyance a ruling on defendant Blount County's motion for summary judgment until additional discovery is conducted. The discovery plaintiff seeks either is not relevant to opposing defendant Blount County's motion or has already been produced by defendant Blount County.

## 2.     Defendant Blount County's Entitlement to Summary Judgment

It is unclear exactly what claims plaintiff asserts against defendant Blount County. In its motion for summary judgment, defendant Blount County submits that plaintiff alleges the following against it: that the county (a) had a custom or practice of arbitrary and unsupervised service of criminal warrants and allowed untrained and unsupervised deputies to arbitrarily and selectively serve said warrants in deliberate indifference to the rights of persons with whom the police come into contact, and (b) has an unconstitutional deadly force policy [*See* Doc 107]. Plaintiff, neither in his response papers nor at oral argument, refuted this characterization, and a review of the amended complaint does not persuade the Court to believe that any other claims, except as discussed herein, have been asserted against defendant Blount County.

### a.     Municipal Liability

A local government is liable under section 1983 only when the government itself commits the constitutional violation, not when the violation is committed by the government's employees. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1985)). To succeed on such a claim, a plaintiff "must prove that the violation of a federal right occurred as the result of an illegal policy or custom." *Sabo v. City of Mentor*, No. 1:10-CV-345, 2010 WL 4008823, at *7 (N.D. Ohio Oct. 12, 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Additionally, the policy or custom must have been the moving force directly

causing the violation. *Id.* (citation omitted). *See also Memphis, Tennessee Area Local v. City of Memphis*, 361 F.3d 898, 902 (6th Cir.2004) (citation omitted).

Examples of a municipal policy or custom may be shown by a plaintiff pointing to a statement by a policymaking official, *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701 (1989), or to a custom so widespread and well-settled "as to have the force of law," *Bd. of Cnty. Commr's of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997), or to inadequate screening, training or supervision by the municipality of its employees, *Bd. of the Cnty. Commr's v. Brown*, 520 U.S. 397 (1997) (screening) and *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (training and supervision).

"[A] municipality [also] can be held liable under Section 1983 for a single decision by the municipality's policymakers," so long as the official "is the one who has the final authority to establish municipal policy with respect to the action ordered." *Feliciano*, 988 F.2d at 655. "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker. *Ebelt v. Cnty. of Ogemaw*, 231 F. Supp. 2d 563, 575 (E.D. Mich. 2002) (citation omitted). Generally, a "final policymaker" is an official whose decisions are (1) "final and unreviewable" and (2) not constrained "by the official policies of superior officials." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir.2005). A district court usually refers to state law for guidance on whether an individual is a final policymaker. *Id.*

### b.    Analysis

For purposes of defendant Blount County's motion for summary judgment, the Court assumes that agents of defendant Blount County, while acting under color of state law, violated plaintiff's constitutional rights.

### (1)    Deadly Force Policy

With respect to plaintiff's argument that defendant Blount County's deadly force policy is unconstitutional and that the officers followed that policy in violation of Mr. Hickman's rights, plaintiff submits that Blount County's policies and procedures manual states that deputies may use deadly force anytime that a suspect has the means and ability to seriously injury others and do not have to wait until a firearm is pointed at someone or a shot is fired to use deadly force [Doc. 123]. Plaintiff admits that some of the language employed by defendant Blount County is traceable to Fourth Amendment opinions, but argues that the language informing deputies that they may use deadly force when a suspect has the means and ability to injure others is not permissible [Id.].

Plaintiff's contention that the county's deadly force policy is unconstitutional lacks merit. Blount County's deadly force policy tracks the language of the relevant Tennessee statutes as well as *Garner*, which held that deadly force may be used where there is probable cause to believe that a suspect poses a threat of serious physical harm and that "statutes with such application would pass constitutional muster." *See Denning*, 564 F. Supp. 2d at 817 (citation omitted). Moreover, at oral argument, counsel for defendant Blount County informed the Court that the portion of the policy informing deputies that they may use deadly

force when a suspect has the means and ability to injure others merely clarifies for officers that they do not have to wait until the suspect shoots. Upon review of the relevant law, the Court is unpersuaded that the policy or the "clarification" language is unconstitutional. Accordingly, plaintiff cannot use such policy as a basis for municipal liability in this case.

### (2)    Service of Criminal Warrants

As noted above, plaintiff asserts that defendant Blount County had a custom or practice of arbitrary and unsupervised service of criminal warrants and allowed untrained and unsupervised deputies to arbitrarily and selectively serve such warrants in deliberate indifference to the rights of persons with whom the police come into contact [*See* Doc. 35].

With respect to having a custom or practice of arbitrarily serving criminal warrants, according to Tennessee state law, victims of domestic abuse are afforded enhanced protection and, if there is probable cause to believe that a person has committed a crime involving domestic abuse, the preferred response is arrest [*See* Doc. 107]. Defendant Blount County submitted evidence that Mr. Hickman's arrest warrant for domestic abuse was issued on February 24, 2008 and was executed on the same day for purposes of Mrs. Hickman's safety [*See id.*]. To the extent plaintiff claims that any order issued by plaintiff's counsel during his tenure as a judge for the Circuit Court for Blount County, Tennessee, serves as evidence that Blount County had a custom or practice of arbitrary service of criminal warrants, the Court disagrees as the orders were directed to the District Attorney and Court Clerk, who were to take action and then consult with the Sheriff. Even if such orders were intended to give notice to the Sheriff to timely serve criminal process, plaintiff cannot rely upon them because

27

Mr. Hickman's arrest warrant was issued and served on the same day. Accordingly, plaintiff has failed to point to any evidence in the record to establish that defendant Blount County had a custom or policy of arbitrarily serving criminal warrants or that, even if it did, such was the moving force directly causing the injury suffered by Mr. Hickman.

With respect to plaintiff's assertion that defendant Blount County allowed untrained and unsupervised deputies to arbitrarily and selectively serve criminal warrants, plaintiff must demonstrate that the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). Plaintiff may prove deliberate indifference by demonstrating that the county failed either to react to repeated complaints of constitutional violations by its officers or to provide adequate training. *Id.* at 390. In both cases, deliberate indifference is established when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." *Id.* at 388-89. More specifically, under Sixth Circuit law, in order to succeed on a failure to train claim, a plaintiff must establish that the training program was inadequate for the tasks that officers must perform, the inadequacy was the result of deliberate indifference, and the inadequacy was closely related to or caused the injury. *Sabo*, 2010 WL 4008823, at *7 (citing *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

Plaintiff has identified no complaints regarding the service of warrants other than the orders identified above, and, given the nature of the orders, the Court does not find the orders sufficient to establish that the county failed to respond to repeated complaints of constitutional violations by its officers. To the extent plaintiff submits evidence of complaints made against Officer Moore [*see* Doc. 123], the Court finds such insufficient to allow a reasonable jury to find deliberate indifference as plaintiff fails to demonstrate that defendant Blount County did not respond to such complaints.

Plaintiff also has not submitted any evidence that the county failed to provide adequate training for serving criminal warrants. Indeed, plaintiff presented no evidence regarding training for service of criminal warrants. Defendant Blount County, however, submitted evidence demonstrating that its arrest procedures inform deputies of the seriousness of the authority and state that only a sworn Tennessee Peace Officer Standards and Training Commission ("POST"), TCI, or DCS certified deputy may execute criminal arrest warrants. [Doc. 107]. It is undisputed that each of the individual defendants was certified by POST and either developed or received training in officer safety, arrest procedures, and statutes [*See id.*].

Nevertheless, even assuming plaintiff has demonstrated either an inadequacy in training officers to serve criminal warrants or a failure to respond to repeated complaints of constitutional violations, plaintiff fails to point to any evidence in the record to establish a need for more or different training that was "so obvious" to defendant Blount County or to

a direct causal link between any deficiency in such training and any injury suffered by Mr. Hickman.

### (3)    Plaintiff's Other Claim

In his response to defendant Blount County's motion, plaintiff argues that there is a genuine issue of material fact as to whether policy makers of Blount County participated in a plan to act against Mr. Hickman with excessive force and in violation of his constitutional rights [Doc. 123]. Plaintiff points to Chief James B. Long, who plaintiff claims approved the plan to arrest Mr. Hickman [*Id.*]. Although plaintiff attempts to establish that Chief Long makes policy within the Blount County Sheriff's Office, plaintiff does not point to sufficient evidence to suggest that Chief Long "is the one who has the final authority to establish municipal policy with respect to the action ordered." *Feliciano*, 988 F.2d at 655. Plaintiff merely points out that Chief Long handles excessive force complaints and supervises the patrol and investigation units within the Blount County Sheriff's Office [*Id.*].

In sum, plaintiff has failed to refute defendant Blount County's request for summary judgment. The Court, therefore, will grant defendant Blount County's motion and defendant Blount County will be dismissed from this case.

### III.    Appeal and Objection to Magistrate's Ruling Denying Rule 56(f) Continuance for Discovery and Granting Motion for Protective Order

Plaintiff has filed an Appeal and Objection to Magistrate's Ruling Denying Rule 56(f) Continuance for Discovery and Granting Motion for Protective Order [Doc. 113]. Both

defendant Blount County and the individual defendants filed a response in opposition [Docs. 125, 127].

The Court has reviewed Magistrate Judge Shirley's Memorandum and Order [Doc. 112] pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(a). After such review, the Court concludes that Judge Shirley's rulings were neither clearly erroneous nor contrary to law. Moreover, the issues raised by plaintiff's appeal are moot because the Court has decided to grant in part and deny in part the individual defendants' motion for summary judgment for reasons unrelated to Judge Shirley's rulings.

Accordingly, the Court finds that plaintiff's Appeal and Objection to Magistrate's Ruling Denying Rule 56(f) Continuance for Discovery and Granting Motion for Protective Order [Doc. 113] is without merit and will be denied.

## IV. Conclusion

For the reasons explained above the Court will **GRANT IN PART and DENY IN PART** the Motion for Summary Judgment of Doug Moore, Lesley Craig, Robert Berkley, and Matthew Gilmore in their Individual Capacity [Doc. 71] and Craig, Berkley and Gilmore will be dismissed from this case; the Court will **GRANT** Defendant Blount County's Motion for Summary Judgment [Doc. 106] and defendant Blount County will be dismissed from this case; the Court will **DENY** plaintiff's Appeal and Objection to Magistrate's Ruling Denying Rule 56(f) Continuance for Discovery and Granting Motion for Protective Order [Doc. 113]; and the Court will **DENY** Plaintiff's Rule 56(f) Motion to Hold in Abeyance Ruling on

Defendant, Blount County's, Motion for Summary Judgment Until Oral Discovery is Conducted and All Cell Phone Records are Produced [Doc. 115].

ORDER ACCORDINGLY.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE